[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 22-12798

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

*versus*

ANDREW BUTLER, III,
a.k.a. Andrew Butler

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Florida
D.C. Docket No. 5:21-cr-00010-RH-MJF-1

_____

Before JORDAN, LAGOA, and HULL, Circuit Judges.

JORDAN, Circuit Judge:

A jury found Andrew Butler III guilty of knowingly and intentionally possessing five grams or more of methamphetamine with the intent to distribute. *See* 21 U.S.C. § 841(a)(1), (b)(1)(B)(viii). The district court sentenced him to 84 months of imprisonment, to be followed by five years of supervised release.

Mr. Butler argues on appeal that the district court erroneously revoked his Sixth Amendment right to self-representation—resulting in his being represented by counsel at trial—and that the evidence was insufficient to support the jury's verdict. After review of the record, and with the benefit of oral argument, we affirm. First, the district court did not err in revoking the right to self-representation given Mr. Butler's disruptive behavior over a lengthy period of time. Second, the evidence—including the methamphetamine found in the safe of the hotel room where Mr. Butler was staying, and the incriminating post-arrest recorded call with his girlfriend—was sufficient to support the conviction.

## I

On August 18, 2020, Sergeant Steven Cook of the Bay County Sheriff's Office observed a black Nissan failing to maintain its lane on Highway 231 near Panama City, Florida. He ran the license plate and learned that the car had been stolen. He then conducted a traffic stop and arrested Mr. Butler, who was driving the car, and his girlfriend, Kelly Swaby, who was in the passenger seat.

Sergeant Cook and another officer searched Mr. Butler, Ms. Swaby, and the car. They found a key which appeared to belong to a Sentry safe in Mr. Butler's pocket, and a room key, labeled with the number 3, in Ms. Swaby's purse. Inside the car, they found a glass pipe, a metal can, a glass bowl, and a scale, each of which had methamphetamine residue. They also found several unused plastic sandwich bags.

When Sergeant Cook asked Ms. Swaby about the numbered room key, she said that she and Mr. Butler were staying in Room 3 at the Youngstown Motel and that there was a safe in the room which contained methamphetamine. Mr. Butler acknowledged that Room 3 was being used to sell methamphetamine, but said that they had already checked out of the Youngstown Motel and could not be held responsible for anything found in Room 3.

Based on this information, Sergeant Cook obtained a warrant to search Room 3 at the Youngstown Motel. Inside Room 3 was a small Sentry safe, which he opened using the key found in Mr. Butler's pocket. The safe, in turn, contained roughly 45 grams of a methamphetamine mixture in several small bags, as well as a loaded magazine of ammunition. Elsewhere in Room 3 were a scale with methamphetamine residue, a drug press, a small container with the word "cut" written across the lid, a loaded pistol, and a separate handgun corresponding to the magazine found in the safe.

## II

A grand jury indicted Mr. Butler on several charges.  Count 1 charged him with possession of five grams or more of methamphetamine with the intent to distribute, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(B)(viii).  Count 2 charged him with possession of a firearm and ammunition by a convicted felon in violation of 18 U.S.C. § 922(g)(1).

On March 29, 2021, the district court appointed Assistant Federal Public Defender Elizabeth Vallejo to represent Mr. Butler. The appointment, however, did not last long.  Within a few months, Mr. Butler informed the district court that Ms. Vallejo was not properly investigating his case and that he planned to request substitute counsel.  In response, the district court set a hearing to consider Mr. Butler's dissatisfaction with Ms. Vallejo.  But the hearing did not take place as scheduled.

More than once, Mr. Butler delayed the hearing by expressing conflicting views on Ms. Vallejo's performance—at first seeking to replace her, then seeking to retain her, and finally seeking to replace her yet again.  He also forced the district court to hold the hearing remotely by video conference, rather than in person, by twice refusing to exit his cell for the rescheduled hearing.  He informed the deputy marshals at the detention center that "he had retained an attorney who told him not to come to court," when in fact he had not retained anyone.  The district court, "hoping to avoid a forced cell extraction . . . scheduled another hearing

. . . believing that Mr. Butler might participate if he could do so without leaving the detention center."

On July 26, 2021, Mr. Butler participated in a video conference before a magistrate judge. He confirmed that he had not retained private counsel and said that he wanted to have Ms. Vallejo replaced. The magistrate judge obliged him by relieving Ms. Vallejo and appointing Robert A. Morris, an attorney from the Criminal Justice Act Panel. In doing so, the magistrate judge explained to Mr. Butler that though he was entitled to an appointed attorney, he was not entitled to one of his own choosing. "[R]eplacement of an appointed attorney," he told Mr. Butler, "was the exception, not the rule."

Mr. Morris immediately undertook the defense of Mr. Butler. By the end of the week, he had spoken with his client, contacted the prosecutor for discovery, identified three potential witnesses, and filed a motion to suppress. Appearing before the district court, Mr. Morris indicated that he was getting up to speed on the case: "I've got my foot on the gas pedal, so I think we are in pretty decent shape from the defense perspective."

The very next week, though, Mr. Butler violated the district court's local rules, *see* N.D. Fla. L.R. 11.1(F), by filing the first of several *pro se* motions disparaging Mr. Morris and insisting that he take, and refrain from taking, certain actions. Among other things, he characterized Mr. Morris as an untrustworthy attorney who had "no plan [and] no strategy," and demanded that he cancel the

scheduled suppression hearing because he felt as though he was "being ambushed."

On September 1, 2021, the district court held a video status conference in response to these filings. It attempted to assuage Mr. Butler, explaining that he was entitled to proceed *pro se* if he wished, but that Mr. Morris was a talented attorney capable of providing effective assistance. Mr. Morris, in turn, stated that he was "listening to [Mr. Butler] and . . . doing everything" in his power to represent him. During this hearing, which lasted about 30 minutes, Mr. Butler interrupted the district court no fewer than a dozen times, accusing it of bias and Mr. Morris of lying.

The following month, the district court held another status conference. It did so "because Mr. Butler ha[d] continued to submit materials, and ha[d] continued to complain about Mr. Morris' representation."

At the hearing, Mr. Butler suggested that he had already filed a bar complaint, and was about to file a malpractice action, against Mr. Morris for, among other things, lying to him. Mr. Morris explained that he had provided Mr. Butler with all available documents and that his client was fixated on arguments that "the case law . . . prohibit[ed]" or which were "not cognizable." For example, Mr. Butler insisted that law enforcement had conducted an illegal search of Room 3 because the search warrant was not sealed. He also claimed that law enforcement had conducted an illegal search of his car because they had not obtained a warrant to conduct a dog sniff.

Following the status conference, the district court entered an order granting Mr. Morris leave to withdraw as appointed counsel for Mr. Butler. Although "Mr. Butler had not shown good cause . . . Mr. Morris had endured about as much abuse as a panel attorney should be required to endure." With Ms. Vallejo and Mr. Morris relieved of their responsibilities, the district court appointed a third attorney, Richard A. Greenberg, to represent Mr. Butler. The new appointment resulted in another three-month delay of the trial.

On November 11, 2021, Mr. Butler filed a *pro se* motion requesting to represent himself at trial. The following month, the district court held a hearing in which Mr. Butler again alleged foul play and accused his new attorney, Mr. Greenberg, of withholding documents. The district court conducted a colloquy pursuant to *Faretta v. California*, 422 U.S. 806 (1975), and concluded that Mr. Butler was competent and that his repeated demands to proceed *pro se* were knowing and voluntary. It designated Mr. Greenberg as standby counsel and delayed the trial another month so that Mr. Butler could prepare.

In early February of 2022, five days before the beginning of trial, the district court convened an *ex parte* hearing to discuss defense witnesses. The hearing, though, was anything but productive. Mr. Butler insisted on arguing the merits of a prior suppression ruling as well as the propriety of the grand jury proceedings, which he believed were fraudulent due to alleged procedural errors. When the district court informed him that the suppression

ruling was not immediately appealable and that he could not argue substantive matters in the government's absence, Mr. Butler grew agitated.   The district court attempted to regain control several times, but to no avail:

- "Mr. Butler, be quiet for just a minute and I'll call on you when it's your turn to talk.  For just a minute you need to listen. . . ."

- "Just listen until I call on you. . . ."

- "Mr. Butler, if you interrupt me another time, it's going to go badly for you. . . ."

- "Mr. Butler, do not interrupt me again.  I don't know what part you didn't understand, the first four or five times today I've told you not to interrupt me.   Do not interrupt me again. That's as clear as I can make it."

Despite these warnings, Mr. Butler refused to comport himself appropriately.   For example, although he had previously agreed to the new trial date, he threatened to derail the schedule yet again by staying in his cell on the day of the trial: "I don't have what I need. I don't have enough time to prepare . . . . I'm not going to be ready for trial . . . . I'm not going to be there."

Given Mr. Butler's conduct and statements, the district court weighed its limited options: "[M]y choice will be to send the jurors home and not go forward or have the marshals forcibly take Mr. Butler out of his cell . . . bring him to the courthouse . . . bind him and, if necessary, gag him . . . . [I]t's not something I've ever had to

do, and it's not something I want to do." The district court concluded the hearing that day by continuing the trial for the sixth time.

On February 25, 2022, the district court held another status conference to confirm Mr. Butler's attendance at the rescheduled trial. Mr. Butler again refused to cooperate. He alleged, among other things, that officials had fabricated the search warrant and the grand jury indictment. He refused to follow the "talk one at a time" protocol and accused the district court of conspiring to secure a conviction: "[Y]ou want me to go to trial and get my head knocked off . . . . [T]his is illegal . . . . Do whatever you want to do. You can come hogtie me up . . . . [P]ut a ball in my mouth . . . . Do it. I don't care. . . . I mean it, I don't care."

Mr. Butler concluded this outburst by walking out of the proceeding. His conduct was so disruptive that the district court was forced to delay the trial yet again (for the seventh time) to consider his competency at a later date.

The district court held two more status conferences in March of 2022 to determine whether Mr. Butler could stand trial and whether he had forfeited his right to self-representation. Mr. Butler cooperated at these conferences. He spoke in turn, answered questions, pledged to attend trial, and reiterated a desire to represent himself. "I'm going to come any time you tell me to come[.] I'm going to come . . . . You don't have to worry about that." The district court concluded that Mr. Butler could stand trial and proceed *pro se*. It also responded to Mr. Butler's complaints by

relieving Mr. Greenberg as standby counsel and appointing a fourth attorney, Mutaqee Akbar, in his place as standby counsel.[1]

The district court held a final status conference on April 21, 2022, five days before trial, as requested by the defense. Reneging again on his promise that he would be prepared for trial, Mr. Butler declared that he would not be ready. He accused Mr. Akbar of failing to provide him with certain evidence even though the requested documents were irrelevant to the charges. He also accused the district court of bias and repeatedly interrupted. The district court warned Mr. Butler of what was at stake: "I want you to hear what I tell you now and I want you to hear it very clearly. I have tolerated this as long as I am going to tolerate it. If, during the remainder of this hearing, you interrupt me even one more time, I will revoke your ability to represent yourself . . . . There will not be any further chances."

Despite this warning, Mr. Butler interrupted proceedings again almost immediately by speaking out of turn. This prompted the district court to revoke his right to self-representation and to appoint Mr. Akbar as counsel for trial. The district court explained its decision in a later written order: "I said I had tolerated his conduct as long as I was going to tolerate it. I told him there would not be another chance . . . . He promptly interrupted me again, stopping me midsentence as I attempted to ask a question. I did as I said I would do: I terminated his self-representation[.]"

---

[1] Mr. Akbar discharged his duties ably, both in the district court and on appeal.

Following the trial, the jury convicted Mr. Butler of possessing five grams or more of methamphetamine with the intent to distribute. But it acquitted him of knowingly possessing a firearm and ammunition as a convicted felon. The district court sentenced him to 84 months of imprisonment, to be followed by five years of supervised release.

On appeal, Mr. Butler argues that the district court erred by revoking his right to self-representation. He also contends that there was insufficient evidence to support his conviction.

### III

We have not articulated the appropriate standard by which to review a district court's revocation of a defendant's right of self-representation. The Second, Third, Fifth, Eighth, and Tenth Circuits conduct *de novo* review. *See United States v. Hausa*, 922 F.3d 129, 134 (2d Cir. 2019) (per curiam); *United States v. Peppers*, 302 F.3d 120, 127 (3d Cir. 2002); *United States v. Weast*, 811 F.3d 743, 748 (5th Cir. 2016); *United States v. Mosley*, 607 F.3d 555, 558 (8th Cir. 2010); *United States v. Smith*, 413 F.3d 1253, 1279 (10th Cir. 2005). The Seventh Circuit, on the other hand, reviews such a revocation for abuse of discretion. *See United States v. Brock*, 159 F.3d 1077, 1079 (7th Cir. 1998).

One of our prior cases, *United States v. Garey*, 540 F.3d 1253 (11th Cir. 2008) (en banc), supports the majority position. In that case, three days before trial was to begin, the defendant demanded that his appointed counsel be replaced and that he be provided with a new attorney. The district court denied the request and gave the

defendant the option of continuing with his appointed counsel or representing himself. The defendant "refused to choose, repeatedly rejecting [his appointed counsel] while adamantly refusing to waive his right to counsel." *Id*. at 1257. "After numerous attempts to elicit a clear choice from [the defendant] failed, the [district] court determined his conduct evinced a knowing and voluntary waiver of the right to counsel. The [district] court demoted . . . [the] appointed lawyer to the position of standby counsel and allowed [the defendant] to represent himself at trial, where he was convicted on all counts charged." *Id*. at 1258.

The defendant appealed, arguing that the district court had violated his Sixth Amendment right to counsel by forcing him to represent himself when he had not affirmatively asked to do so. We reviewed the challenge *de novo* as presenting a mixed question of law and fact. *See id*. at 1268 (stating that whether the defendant's "waiver of counsel was both knowing and voluntary" is "a mixed question of law and fact which this Court reviews *de novo*"). Based on the record before us, we concluded that the defendant had knowingly waived counsel after the district court repeatedly warned him of the dangers involved. *See id*. at 1268–70. *See also United States v. Stanley*, 739 F.3d 633, 644 (11th Cir. 2014) ("We review *de novo* whether a defendant validly waived the right to counsel as a mixed question of law and fact.").

Guided by *Garey*, we adopt the majority view and review *de novo* whether the district court properly revoked Mr. Butler's right to self-representation because it presents a mixed question of law

and fact. At bottom, the right at stake is a defendant's Sixth Amendment right to self-representation. *See Faretta*, 422 U.S. at 818. And constitutional questions generate *de novo* review. *See, e.g., Benning v. Comm'r, Georgia Dep't of Corr.*, 71 F.4th 1324, 1328 (11th Cir. 2023) ("We review questions of constitutional law *de novo*.").

## IV

The Sixth Amendment grants a criminal defendant the right to counsel, as well as "a correlative right to dispense with a lawyer's help." *Faretta*, 422 U.S. at 814 (internal quotation marks and citation omitted). The Supreme Court has explained that there is "a nearly universal conviction, on the part of our people as well as our courts, that forcing a lawyer upon an unwilling defendant is contrary to his basic right to defend himself if he truly wants to do so." *Id.* at 817. Simply put, the Sixth Amendment grants the "right to defend . . . directly to the accused; for it is he who suffers the consequences if the defense fails." *Id.* at 819–20.

The right to self-representation, though deeply rooted, is not absolute. "It is important to remember that . . . the right to self-representation presuppose[s] a cooperative defendant willing to engage in reciprocal dialogue with the court." *Garey*, 540 F.3d at 1263. As a result, "[t]he right of self-representation is not a license to abuse the dignity of the courtroom. Neither is it a license not to comply with relevant rules of procedural and substantive law." *Faretta*, 422 U.S. at 834 n.46. A court therefore "may terminate self-representation by a defendant who deliberately engages

in serious and obstructionist misconduct." *Id.* (citing *Illinois v. Allen*, 397 U.S. 337 (1970)).

## A

More than 50 years ago, the Supreme Court held that a defendant representing himself in a criminal case can lose his Sixth Amendment right to be present in court if "he engages in speech and conduct which is so noisy, disorderly, and disruptive that it is exceedingly difficult or wholly impossible to carry on the trial." *Allen*, 397 U.S. at 338. The defendant in *Allen* disrupted proceedings by, among other things, making untimely remarks, insulting and threatening the judge, and threatening to delay the trial indefinitely. He did all of those things during *voir dire* on the first day of trial, and the judge removed him from the courtroom after he ignored a warning that no more outbreaks would be tolerated. *See id.* at 340 ("He continued to talk back to the judge, saying, 'There's not going to be no trial either . . . [Y]ou can bring your shackles out and straight jacket and put them on me and tape my mouth, but it will do no good because there's not going to be no trial.' After more abusive remarks by the [defendant], the . . . judge ordered the trial to proceed in [his] absence."). Though mindful that courts "must indulge every reasonable presumption against the loss of constitutional rights," the Supreme Court unanimously upheld the defendant's conviction and held that "a defendant can lose his right to be present . . . if, after he has been warned . . . [he] insists on conducting himself in a manner . . . [such] that his trial cannot be carried on." *Id.* at 343.

As relevant here, the Supreme Court in *Allen* reasoned that if "courts are to remain what the Founders intended . . . their proceedings cannot and must not be infected with the sort of scurrilous, abusive language and conduct" exhibited by the defendant. *See id.* at 346–47. It explained that "trial judges confronted with disruptive, contumacious, stubbornly defiant defendants must be given sufficient discretion to meet the circumstances of each case." *Id.* at 343.[2]

*Faretta* similarly explained that a court "may terminate self-representation by a defendant who deliberately engages in serious and obstructionist misconduct." 422 U.S. at 834 n.46. Although the Supreme Court has not elaborated on what constitutes "serious and obstructionist misconduct" warranting revocation of self-representation, some of our sister circuits have.

The Seventh Circuit addressed the issue of *Faretta* revocation in *Brock*, 159 F.3d at 1079–80. Like Mr. Butler, the defendant there challenged the district court's authority, demanded irrelevant evidence, ignored questions, and stormed out of a pretrial hearing. *See id.* at 1078–79. The district court cited the defendant for contempt and found that he "had forfeited his right to represent himself." *Id.* at 1079. On appeal, the defendant argued, among other things, that his Sixth Amendment right had been violated because

---

[2] *See also Indiana v. Edwards*, 554 U.S. 164, 185 (2008) (Scalia, J., dissenting) ("[I]t is necessary to enable the trial to proceed in an orderly fashion. That overriding necessity, we have said, justifies forfeiture of even the Sixth Amendment right to be present at trial.").

*Faretta* referred only to the "deliberate disruption of trials," and not of pretrial hearings. *See id.* at 1080 (citation omitted).

The Seventh Circuit rejected that argument and held that "when a defendant's obstreperous behavior is so disruptive that the trial cannot move forward, it is within the trial judge's discretion to require the defendant to be represented by counsel." *Id.* at 1079. It explained that the defendant's "conduct made it practically impossible to proceed" and that his pretrial behavior "was sufficient to allow the district judge to conclude . . . that [he] would continue to be disruptive at trial." *Id.* at 1080.

A similar case from the Eighth Circuit involved a *pro se* defendant who sought to challenge the sufficiency of his indictment by filing pleadings that were neither coherent nor relevant. *See Mosley*, 607 F.3d at 557. After the defendant refused to cooperate at a competency hearing, a magistrate judge revoked the defendant's right to self-representation, stating that "either [he] does not understand these proceedings or is not willing to participate in them." *Id.* For months, the defendant "continued his pattern of unresponsiveness," all the while asserting his right to represent himself. *See id.* In turn, the district court, relying on the magistrate judge's reasoning, refused to restore the defendant's right to self-representation. *See id.* at 558–59. The defendant was represented by counsel at trial and a jury found him guilty as charged.

The Eighth Circuit affirmed, holding that "[a] defendant is not entitled to use the right of self-representation as a tactic for delay, for disruption, for distortion of the system, or for manipulation

of the trial process." *Id.* at 558 (internal quotation marks and citation omitted). The defendant's misconduct had "interfered with pretrial proceedings and delayed the trial" to such an extent that "[t]here was good cause to believe that [he] would continue to disrupt the proceedings if the court permitted him to resume self-representation." *Id.* at 559. And it pointed out that the defendant had "refused to respond to . . . questions" and insisted, instead, to "talk . . . about everything but [his] case." *See id.*

Most recently, the Third Circuit heard an appeal involving a defendant who requested to represent himself and demanded that his case be tried outside the circuit. *See United States v. Noble*, 42 F.4th 346, 349 (3d Cir. 2022). For nearly ten months, the defendant undermined the district court's authority by remaining silent. *Id.* He ignored all questions, returned all legal mail, and refused to make eye contact with the district court. *Id.* Based on this conduct, the district court found that the defendant's "behavior was obstructionist and that [he] had therefore waived and forfeited his right to represent himself." *Id.* It appointed counsel for the defendant, who was subsequently tried and convicted by a jury. *Id.*

On appeal, the Third Circuit affirmed the conviction, observing that "it would be impossible to conduct a fair trial with a pro se defendant who refused to cooperate or engage at all with the court." *Id.* at 350. Drawing from both *Brock* and *Mosley*, the Third Circuit concluded that the defendant's "silence was a conscious obstructionist tactic" and commended the district court's "exceedingly patient" approach. *See id.* at 351. As relevant here, the Third

Circuit noted that the district court "did not act prematurely or pri-
oritize expediency over [the] defendant's constitutional rights." *Id.*
On the contrary, the defendant "was permitted to represent him-
self for many months and the right was only deemed waived and
forfeited after repeated obstructionist conduct and warnings[.]" *Id.*

Not all improper behavior, of course, constitutes obstruc-
tionist misconduct justifying the revocation of the right of self-rep-
resentation. For example, the Ninth Circuit has held that the right
to self-representation may not be terminated in situations where "a
defendant files numerous nonsensical pleadings, is uncooperative
at times, insists on wearing prison garb in front of the jury . . . . [or]
merely . . . lacks familiarity with the rules of evidence or the specif-
ics of criminal procedure." *United States v. Engel*, 968 F.3d 1046,
1050 (9th Cir. 2020) (alterations adopted) (internal quotation marks
and citations omitted). The Eighth Circuit has similarly said that
"an annoying mistake . . . that waste[s] the court's time" does not
constitute "the kind of serious obstructionist misconduct" that
merits denial or revocation of self-representation. *See United States
v. Smith*, 830 F.3d 803, 811 (8th Cir. 2016).

### B

We hold that the district court did not err in revoking Mr.
Butler's right to self-representation. We agree with the district
court that "[n]othing in the . . . *Faretta* decision suggests that a

defendant representing himself should be allowed to [behave] in a way that no attorney would be allowed to behave."

The district court articulated in detail its reasons for revoking self-representation, explaining that Mr. Butler had effectively commandeered and abused the judicial process over a long period of time. The revocation was not a premature or quick reaction but a decision taken by the district court in an effort to regain control of the courtroom and the trial schedule following seven continuances of trial. As the district court explained:

> Mr. Butler's obstruction of court proceedings was the worst I have encountered in more than 25 years . . . . Never have I encountered a defendant who refused to come out of his cell . . . forcing me to grant unjustified continuances . . . . Never have I encountered a party who simply walked out of a hearing that was in progress. Never have I encountered a party who effectively shouted me down, repeatedly making it impossible for me to complete a sentence or attempt to manage the proceeding.

The district court concluded that "maintaining orderly, efficient, and fair proceedings [was] nearly impossible" with Mr. Butler representing himself and appointed Mr. Akbar as counsel for trial.

Like the defendant in *Allen*, 397 U.S. at 338–40, Mr. Butler demonstrated a blatant disregard for the rules by frequently interrupting and insulting the district court. He interrupted so frequently that the district court openly questioned whether "[t]he

record [would] fully reflect just how impossible it was to carry on a hearing with Mr. Butler."

But that's not all. While the defendant in *Allen* threatened to delay the trial, Mr. Butler made that threat a reality by walking out of hearings, refusing to attend other proceedings, and threatening not to show up at the trial itself. The events in *Allen*, moreover, transpired on a single day. The misconduct here spanned months and upended the district court's docket for nearly a year. Here's how the district court put the situation:

> It remains true, as it was before, that Mr. Butler has taken over running the case. Mr. Butler is in charge of the schedule. My decisions no longer matter. Mr. Butler is the one that's deciding exactly what happens in the case, when things get scheduled. And by refusing to come out of his cell, he just makes it impossible to have a trial as scheduled. And there is no reason to believe at this point that . . . Mr. Butler won't pull the same stunt again. . . . [T]here won't be any assurance until the morning of the trial when Mr. Butler does or does not show up.

In the end, Mr. Butler forced the district court to continue the trial seven times from May of 2021 to April of 2022.[3]

---

[3] Not all of the delays were due to Mr. Butler's misbehavior, but at least several of them were.

At the last status conference, where Mr. Butler interrupted more than a dozen times, the district court warned him that his *Faretta* right was at risk: "If, during the remainder of this hearing, you interrupt me even one more time, I will revoke your ability to represent yourself . . . . There will not be any further chances." These warnings were consistent with what the Supreme Court required in *Allen*, 397 U.S. at 343, which, as noted, presented a different Sixth Amendment issue.

The record shows that the district court went beyond what was required to accommodate Mr. Butler. Though Mr. Butler never showed good cause to remove his appointed counsel here, *see Thomas v. Wainwright*, 767 F.2d 738, 742 (11th Cir. 1985), the district court nonetheless changed his attorney three times. In the words of the district court, however, "[a]n attorney with the combined skill of John Adams, Clarence Darrow, and Louis Brandeis could not have satisfied Mr. Butler."

In addition, the district court tried to ensure that Mr. Butler received a fair trial. For example, despite his earlier refusal to leave his cell, the district court later declined to extract him, bind him, or gag him after he walked out of a hearing: "I haven't wanted to do that for trial, because frankly . . . it's not going to be fair in front of all the jurors, it's just no way to run a trial."

The Sixth Amendment guarantees fundamental protections but also imposes certain responsibilities on defendants who choose to represent themselves. Cooperation and respect in the courtroom are not mere formalities. They are necessary components of

the judicial process. "It is essential to the proper administration of criminal justice that dignity, order, and decorum be the hallmarks of all court proceedings in our country." *Allen*, 397 U.S. at 343. We expect a district court to exercise some tolerance with a misbehaving *pro se* defendant, but the Sixth Amendment does not demand "the patience of Job." *See James* 5:11 (King James Version).

In sum, the misconduct here was repeated, and it was "serious and obstructionist" within the meaning of *Faretta*. *See Brock*, 159 F.3d at 1078–80; *Mosley*, 617 F.3d at 557–59; *Noble*, 42 F.4th at 349–51. The district court did not err in revoking Mr. Butler's *Faretta* right to self-representation.

## V

We next address Mr. Butler's challenge to the sufficiency of the evidence on the narcotics charge. We review sufficiency challenges *de novo*, viewing the evidence, and all reasonable inferences, in the light most favorable to the jury's verdict. *See United States v. Dixon*, 901 F.3d 1322, 1335 (11th Cir. 2018). "We will not overturn a conviction on the grounds of insufficient evidence unless no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Gladden*, 78 F.4th 1232, 1242 (11th Cir. 2023) (internal quotation marks and citation omitted). "The evidence need not be inconsistent with every reasonable hypothesis except guilt, and the jury is free to choose between or among the reasonable conclusions to be drawn from the evidence presented at trial." *United States v. Mapson*, 96

F.4th 1323, 1336 (11th Cir. 2024) (internal quotation marks and citation omitted).

The jury found Mr. Butler guilty of possession of five grams or more of methamphetamine with intent to distribute in violation of 21 U.S.C. § 841(a)(1), (b)(1)(B)(viii).  In order to prove guilt under § 841(a)(1), the government had to establish three elements beyond a reasonable doubt: (1) knowledge of the controlled substance; (2) possession of the controlled substance; and (3) an intent to distribute.  *See United States v. Poole*, 878 F.2d 1389, 1391 (11th Cir. 1989).  "All three elements can be proven by either direct or circumstantial evidence."  *Id.* at 1391–92.

For "the government to prevail on a charge of possessing, the possession . . . may be constructive . . . [and] may be shared." *United States v. Sarmiento*, 744 F.2d 755, 761 (11th Cir. 1984).  As relevant here, constructive possession may be "proven by showing . . . dominion and control over . . . the premises on which the drugs are concealed."  *United States v. Gamboa*, 166 F.3d 1327, 1331 (11th Cir. 1999) (internal quotation marks and citation omitted).  Intent to distribute may be inferred from the quantity of drugs and the presence of items typically utilized "to separate large [drug] quantities into smaller quantities for retail purposes[.]"  *Poole*, 878 F.2d at 1392.

At trial, Sergeant Cook testified that he found a Sentry key in Mr. Butler's pocket and a room key labeled with the number 3 in Ms. Swaby's purse.  He explained to the jury that his search of the car had uncovered drug paraphernalia typical of distribution, including a glass bowl and scale with drug residue, and several

unused plastic sandwich bags. He also told the jury that, when questioned, Ms. Swaby admitted that she and Mr. Butler were staying in Room 3 at the Youngstown Motel and that there was a safe in the room which contained methamphetamine. Mr. Butler similarly acknowledged that the two had been staying at the Youngstown Motel and that Room 3 was being used to sell methamphetamine.

Sergeant Cook explained that the key in Ms. Swaby's purse opened Room 3, which contained a safe. The Sentry key found in Mr. Butler's pocket unlocked the safe, which contained 45 grams of methamphetamine packets alongside a whisk, strainer, and spatula. Based on his seven years of experience, these items were typically used to weigh, mix, repackage, and sell drugs.

The government also called Special Agent A.C. Llorens and Jorge Betancourt—the owner of the Youngstown Motel—to establish that Mr. Butler and Ms. Swaby had, in fact, been staying in Room 3 on the day of the arrest. Agent Llorens testified that he had obtained a photocopy of Mr. Butler's ID and a receipt with Ms. Swaby's credit card number for Room 3 that same day. Mr. Betancourt, meanwhile, testified as to the normal course of business at the Youngstown Motel. He explained that the front desk typically collected IDs and credit cards from guests when they checked in. He also told the jury that Mr. Butler and Ms. Swaby had rented Room 3 together and that she had later returned to collect certain belongings that they had left behind.

In addition, the government introduced a post-arrest recorded call between Mr. Butler and Ms. Swaby in which the two discussed blaming others for the drugs found in Room 3. Ms. Swaby apparently believed that some mutual acquaintances had entered Room 3 while she and Mr. Butler were detained and had taken some of their belongings: "You know they went in our room and took everything . . . Kelly and David and them." Mr. Butler then suggested they could blame the acquaintances: "[I]f they went in there, that means . . . any charges . . . for the stuff that was in there could have been theirs . . . we are going to put everything on them . . . [by] saying that whatever was in the room was theirs." Ms. Swaby agreed.

Viewing all of this evidence in the light most favorable to the government, and drawing all reasonable inferences in favor of the jury's verdict, we conclude that there was sufficient evidence to prove beyond a reasonable doubt that Mr. Butler possessed methamphetamine with the intent to distribute it.

## VI

The district court did not err in revoking Mr. Butler's Sixth Amendment right to self-representation. And the evidence was sufficient to support the jury's guilty verdict.

**AFFIRMED**.